IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ALABAMA
EASTERN DIVISION

HAYNES MACHINE COMPANY, INC.
et al

        Plaintiffs,

v.                                                                    CV 00-PT-2458-E

KEN LIPHAM, et al

        Defendants.



## FINDINGS OF FACT AND CONCLUSIONS OF LAW

This cause came on to be heard, on November 21, 2000, on plaintiffs' application for preliminary injunction. The parties first agreed to submit on affidavits and briefs. The court thereafter heard a witness from each side. The parties have not proffered any other evidence and have not objected to the procedure.[1]

Neither personal jurisdiction nor subject matter jurisdiction, as such, are contested. The defendants do argue that the action is not ripe or is otherwise premature because of a "Standstill and Tolling Agreement" entered into by the parties on October 29, 1999.

Plaintiffs allege the following causes of action: (1) Violation(s) of CERCLA; (2) Negligence per se; (3) Fraud; (4) Breach of Contract and (5) Contractual and Common Law Indemnification. By virtue of the alleged fraud, plaintiffs seek to rescind a sale-purchase

---

[1] In some instances the references to "plaintiffs" and/or "defendants" may or may not factually or legally pertain to all plaintiffs or all defendants. The court will, however, refer to the plaintiffs and the defendants as if each side has one common interest.

transaction and further seek equitable damages and attendant remedies. The fraud count and the request for rescission provide plaintiffs' purported bases for injunctive relief. The CERCLA claim(s) provide the purported basis for subject matter jurisdiction.

## Undisputed Facts

On July 31, 1998, the plaintiff Haynes Machine Company, Inc. purchased certain real estate, equipment, inventory, etc., located at 25 Sherman Drive, Coldwater Industrial Park, Oxford, Calhoun County, Alabama ("property") from defendant Oxford Machine Company, Inc. A portion of the purchase price was financed by the defendants who retained liens on the property. The "Agreement for Purchase and Sale of Assets" dated July 31, 1998, does not contain any specific language which addresses environmental concerns. Apparently, the only written language which the plaintiffs rely upon to support their claims of fraud is the language in paragraph 7(b) of the purchase agreement and certain language with reference to an interview with defendant Ken Lipham noted in a "Phase 1 Environmental Site Assessment" dated July 10, 1998. There is a reasonable inference that this said assessment was prepared in conjunction with the planned closing scheduled for July 31, 1998 for, at least partially, the known benefit and edification of the plaintiffs.

On October 29, 1999 the parties to this action entered into a "Standstill and Tolling Agreement." Said agreement notes that after an ADEM inspection of the property and notice to plaintiffs on or about July 27, 1999, the plaintiffs suspended payment of monthly payments due under purchase money notes and filed a civil action (not the present action) in this court. The said agreement further states that after said suspension of payments, the defendants declared the notes to be in default and accelerated the due dates and commenced foreclosure.

The said agreement further contains the following pertinent provisions:

"WHEREAS, Haynes and Oxford have reached an agreement pursuant to which (1) Oxford will assume responsibility for the investigation and remediation of the contamination in accordance with applicable law and directions from the federal and state agencies having jurisdiction over the property, (2) Haynes will re-commence making monthly installment payments under the notes, (3) Oxford will suspend its efforts to conduct a non-judicial foreclosure sale of the property, and (4) Haynes will dismiss the lawsuit without prejudice . . . ."

. . . .

"Haynes will agree to re-commence making monthly installment payments under the notes in January 2000 and continuing throughout the term of this Agreement. . . . Haynes' obligation to make monthly installment payments under the notes in accordance with this Agreement is subject to Oxford's performance in accordance with this Agreement . . . ."

. . . .

"Oxford will commence and diligently pursue the investigation and remediation of the contamination at the property in accordance with the requirements of all applicable laws and the direction of federal and state agencies, including specifically the Alabama Department of Environmental Management ("ADEM"), and in accordance with the Access Agreement executed between the parties. The terms of the Access Agreement, and the obligations imposed upon the parties thereunder, are incorporated by reference as if fully set forth here. . . ."

. . . .

"Within ten (10) days from the execution of this Agreement by all parties, Haynes will file a dismissal of the lawsuit without prejudice. Oxford agrees and acknowledges that, by dismissing the lawsuit, Haynes in no way waives or releases any of its claims against Oxford and remedies provided therefor by law, including, without limitation, Haynes' claim that it is entitled to rescind its purchase and sale of the property and business based upon Oxford's alleged fraud. Oxford further agrees and acknowledges that it will not raise any defenses to Haynes' claims in the event that Haynes later files similar claims based upon the fact that Haynes dismissed the lawsuit pursuant to this agreement.

The parties agree and acknowledge that they will not commence any litigation against one another arising from or relating to the contamination, the property, the business, and/or notes during the term of this Agreement."

3

. . . .

"Unless earlier terminated in accordance with the terms hereof, this Agreement shall terminate upon the receipt by Haynes of a "No Further Action Letter ("NFA") from ADEM approving Oxford's plan (the "Plan") for "clean closure" of the property under all applicable federal and state laws, rules, regulations and ordinances, implementation of the Plan, and completion of the work called for in the Plan. Upon termination of this Agreement, each party shall be entitled to pursue any legal rights it may have against another party.

If any party hereto contends that another party has defaulted under the terms of this Agreement, such party shall send a written notice of default to the defaulting party as provided herein. Upon the defaulting party's failure to cure said default within ten (10) days from receipt of said notice, this Agreement may be terminated upon written notice to the other parties. In the event this Agreement is terminated as provided herein, all parties shall be entitled to assert fully their legal rights arising from or relating in any way to the notes, the purchase and sale of the property and the business, and/or the presence of the contamination at the property in the same manner as if the parties had not entered into this Agreement."

. . . .

"By executing this Agreement, no party shall be deemed to have admitted any liability for the presence of the contamination on the property or any damages arising with regard thereto, including in connection with the lawsuit."

. . . .

"This agreement contains all agreements and representations of the parties with respect to the subject matter hereof. Neither party has relied on any representations or inducements except as set forth herein. No oral modification is permitted to the agreements made herein, nor shall waiver, estoppel, or other doctrine be used to avoid the effect of the parties' acknowledgment that this agreement represents their full and complete agreement concerning the subject matter hereof, which may not be altered, amended, and/or supplemented except in writing signed by all parties hereto."

. . . .

"This agreement was drafted with the full participation of all parties hereto. Accordingly, if there is any ambiguity in this Agreement, it shall not be resolved against any particular party hereto, but rather shall be resolved by a fair

reading of what the Agreement was intended to provide."

On July 26, 2000, the plaintiffs sent a notice of default by letter to the defendants.

The letter states, inter alia, the following:

> "Under the agreements, Oxford was obligated to "commence and diligently pursue the investigation and remediation of the contamination at the property in accordance with the requirements of all applicable laws and the direction of federal and state agencies, including specifically the Alabama Department of Environmental Management ("ADEM"). [Standstill Agreement P.2.] As you know, Haynes has been monitoring Oxford's investigation and response to the contamination. Based on its observations, Haynes has determined that Oxford is not complying with its obligations under the Agreements. Oxford has failed to investigate and remediate the contamination in accordance with applicable laws by, among other things, failing to establish the direction in which grounds water beneath the property is flowing and failing to establish the up-gradient and down-gradient extent of contamination in the groundwater beneath the property.
>
> You are hereby notified that Oxford is in default of the Agreements. Unless Oxford remedies its default within ten (10) days from the date of the letter, Haynes intends to pursue its legal remedies, including, without limitation, the termination of the Standstill Agreement and the institution of legal action against Oxford. Any correspondence concerning this matter shall be directed to the undersigned. A copy of this letter is provided to Oxford's counsel in accordance with the Standstill Agreement."

The defendants responded by letter dated August 2, 2000. The response included:

> "My client agreed to remedy the problem at the site in accordance with the law. This is precisely what my client is doing, promptly and properly. In addition to the extensive Closure Plan which has been submitted to ADEM by American Environmental Engineering, which goes into detail concerning the removal of contaminated soil and the existence of groundwater contamination (which was caused by the careless manner in which your client conducted his initial 'investigation,' by leaving bore holes open to the environment for weeks, in clear violation of even the most rudimentary environment engineering standards). Indeed, AEE was at the site on the very day you wrote your letter taking additional samples."
>
> . . . .

"As you know, ADEM is the authority over this project. A plan has been submitted to ADEM at my client's sole cost. For my client to move forward and do anything other than take additional samples as he has done is contrary to common sense, as well as good engineering practices. ADEM may decide that what has been proposed is exactly what is needed; on the other hand, ADEM may insist that something completely different be done. For my client to move forward and take active steps may (contrary to what your client is *supposed* to want) actually exacerbate the situation (much like your client's initial 'investigation'). To call his compliance with usual, standard, and reasonable engineering practices a 'default' is an inaccuracy, if not a falsehood, that only lack of knowledge can explain or excuse. Your client, who has admitted to falsifying records to ADEM, is fully aware of the bureaucratic process. These things take time. If Mr. Haynes is aware of a different procedure, let us know. Nothing he has done in the past has implied such knowledge."

### Further Facts and Discussion

The initial present dispute between the parties centers around the application of a provision in the Standstill and Tolling Agreement that "The Parties agree and acknowledge that they will not commence any litigation against one another arising from or relating to the contamination, the Property, the Business and/or Notes during the term of this Agreement." The Standstill and Tolling Agreement provides, from plaintiffs' perspective, for termination in only two instances: (1) Receipt by Haynes of a "No Further Action Letter ("NFA") from ADEM . . . ." (not here applicable); and (2) Defendants' failure to "commence and diligently pursue the investigation and remediation of the Contamination at the Property . . . ."

There is no question that defendants "commenced." The first issue revolves around whether the defendants have "diligently pursued . . . ."

The Standstill and Tolling Agreement is dated October 29, 1999. The defendants thereafter hired and retained American Environmental Engineering, Inc. which, by December 31,

6

1999, prepared an extensive closure plan for submission to ADEM.[2] The <u>plaintiffs'</u> expert witness testified that American Environmental Engineering, Inc. is eminently qualified in its area of environmental work. Thus, early on, defendants had retained an eminently qualified firm which promptly prepared a closure plan. The defendants hired and paid for this qualified firm because it was the expert and was imminently qualified. Defendants have, thus far, paid this expert in excess of $80,000.00. It seems apparent that the parties did not contemplate that the defendants themselves would personally do "the investigation and remediation . . ."

On September 19, 2000, defendant Lipham and ADEM entered into a consent order which required Lipham to, <u>inter alia,</u> submit within 180 days, "a complete Closure and Contingent Post Closure Plan" acceptable to ADEM. The order further requires, within prescribed time frames, compliance with the approved closure plan. ADEM has acknowledged that as of November 21, 2000, Lipham was "in compliance with the terms of the consent order."

It is apparent to this court that all the defendants could be reasonably expected to do, in the absence of specifically stated and designated deadlines, was to hire a qualified expert who would then act as an independent contractor. There is no evidence that the defendants directed its expert in its activities or took any action to delay it. Plaintiffs have not really questioned the diligence, as such, of the defendants themselves. The only question of diligence has been raised by one expert regarding the diligence of another expert. Even there, plaintiffs' expert recognized that there might be a ground for disagreement. The court has seen evidence that, at least as early as November 9, 1999 (perhaps earlier), defendants' expert was doing boring. This was only

---

[2] Apparently, the defendants may have hired their expert on October 25, 1999, before the date of the Standstill and Tolling Agreement.

eleven (11) days after the parties' agreement was signed. There is no evidence that, thereafter, the defendants took any action to direct the activities of its expert or that it took any action to delay its expert. There is no evidence that the defendants made any decisions, themselves, with regard to investigation of the water contamination. The court cannot conclude that the plaintiffs are likely to succeed or prevail on an issue of whether the defendants "diligently pursued" the investigation, etc.

The court having decided that it cannot conclude that the plaintiffs had a reasonable basis for terminating the Standstill and Tolling Agreement, the next issue is whether the court can, at this time, consider the plaintiffs' complaint.[3] The confusion in the case is compounded by the fact that the defendants, apparently without have specifically given their own notice to terminate the Standstill and Tolling Agreement, have given notice to accelerate the due date of the notes and have begun non-judicial foreclosure. This further raises a question as to whether this foreclosure action constitutes the "commencement of litigation ... ." The Standstill and Tolling Agreement states that "Haynes' obligation to make installment payments under the notes in accordance with this Agreement is subject to Oxford's performance in accordance with this Agreement ... ." The court cannot conclude that plaintiffs have been excused from making payments.

## Applicable Law

Plaintiffs' right to obtain an injunction is, under any view of the facts, subject to the

---

[3]Plaintiffs have argued that the court cannot consider this argument of the defendants. The court disagrees. It is integrally connected to the issue of whether an injunction should be granted. Plaintiffs responded to defendants' motion before the hearing.

8

following essential elements as to which the plaintiffs have the burden of proof. The plaintiffs must prove by a preponderance of the evidence that (1) There is a substantial likelihood plaintiffs will succeed on the merits; (2) The plaintiffs will suffer irreparable injury unless the court enjoins the defendants; (3) The threatened injury to the plaintiffs outweighs the threatened harm to the defendants; and (4) An injunction would not be adverse to the public interest. The court concludes that only (1), (2) and (3) are pertinent here and will discuss those issues.[4]

### Likelihood of Success

As stated, the court has concluded that it is not likely that the plaintiffs will succeed on a claim that the defendants defaulted under the terms of the Standstill and Tolling Agreement. There is a reasonable inference, established by a preponderance of the evidence, that the defendants, prior to the sale-purchase agreements had caused the property to be contaminated with chromium. There may be a reasonable inference, somewhat disputed, that defendants suppressed this information.

### Adequacy of Legal Remedy, Irreparable Damage and Relative Harm

The plaintiffs have had possession and use of the property for some twenty-seven plus months. By the time of the scheduled foreclosure, the plaintiffs will have had said possession and use for twenty-eight full months. The plaintiffs have acknowledged that the alleged contamination has not impeded the use of the property or the operation of the business.

Notwithstanding the unimpeded possession and use of the property, a substantial down-payment at the time of purchase and some principal reduction of the note balances, plaintiffs now

---

[4]The public interest issue is a draw.

9

state that the property is not worth what is owed to defendants on the notes. A practical evaluation suggests that what the plaintiffs stand to gain is the recovery of their down payment and, possibly, some consequential damages. In an unrecorded phone conference on November 25, 2000, at 9:00 a.m., the plaintiffs acknowledged that there is no evidence before the court as to whether the operation of the business has or has not been profitable to the plaintiffs. On the other hand, the defendants are clearly being denied due payments. If the operation has been profitable to the plaintiffs, they had less justification for ceasing the payments. If it has been unprofitable, they will suffer no apparent injury from the foreclosure. This is particularly true since the plaintiffs say that the property is not now worth the $1,166,406.20 approximate principal which they owe. Based on the plaintiffs' version, its possession, operation and use of the property results only in a down slide of its value. This could, of course, result not only in an added burden to the plaintiffs but also to the defendants. The plaintiffs have not suggested that they will gain by the continued possession, use and operation of the property. If, indeed, they will lose, they will suffer little or any injury from foreclosure. If there is a foreclosure, the plaintiffs will have some security in that they will have a right of redemption for a period of time within which this action should be tried. On the other hand, the defendants, having no effective control over the property may be harmed. Under the present circumstances, the plaintiffs have the property and some possibility of return. The defendants are receiving nothing.

    Another factor which should be considered with regard to the relative harm to the parties is the fact that the defendants had financed the sale for the plaintiffs and there was, at the time the plaintiffs suspended payments, still a balance of some $1,186,000.00 due to the defendants by the plaintiffs. The plaintiffs had some thirteen years remaining to pay this amount. There was

more than ample time remaining to complete the clean up by the defendants before the plaintiffs paid down to their own possible cost of clean up. Plaintiffs acknowledge that the contamination did not harm the operation. The source of contamination had been cleaned up. There is a reasonable inference that plaintiffs were more interested in aborting the purchase than in remediation. The original balance on the notes had been $1,200,000.00. In two years, the principal had only been reduced by some $34,000.00. Furthermore, there was an additional interest amount due of some $20,000.00. In essence, the plaintiffs would have likely suffered no harm from the continuation of making payments other than the loss of a desired opportunity to rescind.

As a practical matter, plaintiffs' action is one for recover of damages that is, their down payment etc. There is an adequate remedy at law for such a recovery. The fact that any such judgment which may be recovered will not be secured is not controlling. Compare Mitsubishi International Corp. v. Cardinal Textile Sales, Inc., 14 F.3d 1507 (11th Cir. 1994).

### Ultimate Conclusion of Court

The court concludes that it cannot, based upon the evidence and law, enjoin the defendants' foreclosure. There is no evidence that the defendants had not undertaken their clean up obligations in good faith, nor that they had not continued to do so up to the time of plaintiffs' default. The good faith of the plaintiffs in suspending payments is more questionable. The plaintiffs have not met their burden of proof with regard to the requisites for preliminary injunction. It is not necessary for the court to conclude whether the Standstill and Tolling Agreement has been effectively terminated by either side. Plaintiffs clearly intended to terminate it and so notified the defendants. While that termination was not likely based on good cause and

may not have been effective, plaintiffs would likely be estopped to deny that their termination notice allowed defendants to initiate foreclosure proceedings on default in payment; particularly where the Standstill and Tolling Agreement does not specifically preclude a non-judicial foreclosure in the event of a default in the payment of the notes. In any event, the court concludes that the plaintiffs did not act equitably in terminating said Agreement. Even if plaintiffs' action is not premature because of the Standstill and Tolling Agreement, they have not acted equitably in suspending the payments called for under said Agreement. One who seeks equity must do equity.

This the 27th day of November, 2000.

*/s/ Robert B. Propst*
ROBERT B. PROPST
SENIOR UNITED STATES DISTRICT JUDGE